David CALISE et al.

v.

William CURTIN et al.

No. 2004–375–Appeal.

Supreme Court of Rhode Island.

June 23, 2006.

Fred L. Mason, Jr., Esq., for Plaintiff.

Patrick B. Landers, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., and GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

**OPINION**

Chief Justice WILLIAMS, for the Court.

Barbara Calise (Calise) and David Calise (collectively plaintiffs) appeal the entry of judgment as a matter of law as to negligence by a trial justice in favor of William Curtin (Curtin) and the State of Rhode Island (collectively defendants).[1] Amica Mutual Insurance Company (Amica) brought this subrogation action in the Superior Court in the name of plaintiffs, their policyholders. The defendants also filed a

1. Originally Bruce Ryan (Ryan) was also a defendant in the Superior Court action. Ryan was severed from the case by order on October 4, 2004, one day before the commencement of the trial.

cross-appeal, challenging the denial of their motion for judgment as a matter of law as to Amica's standing. This case came before the Supreme Court for oral argument on March 28, 2006, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After hearing the arguments of counsel and examining the record and the memoranda filed by the parties, we are of the opinion that this appeal may be decided at this time, without further briefing or argument. For the reasons set forth below, we reverse the trial justice's entry of judgment as a matter of law as to negligence, and affirm the trial justice's ruling on the issue of standing.

## I

### Facts and Travel

This case arises out of an automobile accident on January 2, 2001, at the intersection of Warwick and Park Avenues in Cranston (intersection). Three vehicles were involved in the collision; they were operated by Calise, Curtin and Bruce Ryan (Ryan), respectively.

Calise testified that on the night of the accident, she was driving to her job at Rhode Island Hospital. She left her house at 10:30 p.m. and proceeded on her typical route: eastward along Park Avenue to Warwick Avenue.[2] When she reached the intersection, Calise stopped at the red light. She observed an Adult Correctional Institutions van (ACI van) directly across the intersection from her vehicle on Park Avenue: Calise was facing east while the ACI van was facing west. When the light turned green, the ACI van began to proceed straight through the intersection, while Calise waited to make a left-hand turn onto Warwick Avenue. As the ACI van traveled through the intersection, it struck Calise's vehicle head-on. Although she did not dispute that Ryan's vehicle struck the ACI van first, causing it to collide with Calise's vehicle, Calise did not see Ryan's vehicle before she was hit, nor did she witness the impact of Ryan's vehicle and the ACI van.

Curtin, the driver of the ACI van, testified for plaintiffs as an adverse witness that his job as a prison guard entailed driving female prisoners to various job sites. On the night of the accident, he was returning from a job site in Cranston, at the eastern end of Park Avenue. He drove west on Park Avenue toward the intersection at a speed of twenty miles per hour; he then stopped at the red light directly across the intersection from Calise's vehicle. Curtin, however, saw Ryan's vehicle before he saw Calise's vehicle. Ryan's vehicle, a Nissan Maxima (Maxima), was driving erratically. Curtin observed the Maxima approaching from his left, in a northerly direction on Warwick Avenue. The Maxima was cutting into the left side of the road—the side designated for opposing traffic—ostensibly in preparation to make a turn. But while both Calise and Curtin remained stopped at their respective red lights, the Maxima, which had seemed to be preparing to turn left onto Park Avenue, instead continued north on Warwick Avenue. Curtin watched Ryan's vehicle pass him from left to right, and watched it proceed north on Warwick Avenue, until it was out of sight, because Curtin "was thinking to [himself] basically there was something not right with that driver." It took fifteen to twenty seconds

2. For the purposes of clarifying the positions of the three cars prior to and during the collision, we note that at their intersection, Warwick Avenue runs north and south and Park Avenue runs east and west.

for Ryan's vehicle to pass from Curtin's sight.

About "a second or two" after his traffic light turned green, Curtin proceeded into the intersection. He did not look to his right; he said his "vision was enough just to take in the intersection so [he] saw nothing coming from either side." He testified that he did not really know what happened next, but he believed that as he drove into the intersection, his vehicle was hit immediately on the right passenger side by the Maxima. Curtin testified that he never saw the Maxima turn around on Warwick Avenue. Curtin did not realize until he had recovered from a brief bout of unconsciousness that as a result of the impact between the ACI van and the Maxima, the ACI van had in turn struck Calise's vehicle.

The plaintiffs brought a claim against Amica and received $100,000 in a settlement for Calise's bodily injury. David Calise also brought a claim against Amica and received $9,325 in a settlement for property damage to the automobile. Amica's payment to plaintiffs was based on the coverage extended to them under an uninsured/underinsured motorist clause in their policy because Ryan was uninsured within the definitional provisions of that clause and pursuant to G.L.1956 § 27–7–2.1. Once Amica settled with plaintiffs for the uninsured motorist claim, Amica and plaintiffs signed a trust agreement endorsing all of plaintiffs' rights in the matter to Amica, which then pursued litigation against defendants.

At the conclusion of plaintiffs' case, defendants made two motions for judgment as a matter of law pursuant to Rule 50 of the Superior Court Rules of Civil Procedure. In their first motion, defendants argued that, based on § 27–7–2.1(h), Amica lacked standing to bring this claim against defendants in plaintiffs' names. The trial justice denied this motion. The second motion requested judgment as a matter of law based on plaintiffs' failure to raise any factual issues regarding their negligence claim. The trial justice granted this motion. The plaintiffs appealed this entry of judgment as a matter of law; [3] the defendants, in turn, filed a cross-appeal, citing as error the trial justice's denial of defendants' Rule 50 motion on lack of standing.

## II

### Analysis

On appeal, plaintiffs contend that the trial justice erred in granting Curtin's motion for judgment as a matter of law because legally sufficient evidence was presented to support their negligence claim. In their appeal, defendants contend that the trial justice should have granted their motion for judgment as a matter of law on the issue of standing, because Amica lacked standing to bring suit in the name of plaintiffs. We address each issue separately below.

### A

#### Negligence

■ The plaintiffs contend that the trial justice committed error by granting defendants' Rule 50 motion because plaintiffs presented legally sufficient evidence to allow a reasonable jury to find in their favor. We review the entry of judgment as a matter of law by applying the same

---

3. The plaintiffs' notice of appeal could not be located in the Superior Court file. However, plaintiffs supplied this Court with an affidavit attesting to its timely filing, and attached a receipt issued by the Superior Court clerk corroborating this affidavit. Neither defendant contests that plaintiffs are properly before this Court.

standard as the trial justice, " 'consider[ing] the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and draw[ing] from the record all reasonable inferences that support the position of the nonmoving party.' " *Tedesco v. Connors*, 871 A.2d 920, 927 (R.I.2005). "If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party * * *." Super. R. Civ. P. 50(a)(1).

■ This Court has long clarified the duty of drivers at an intersection as follows:

"When approaching an intersection, a motorist has the duty 'of observing the traffic and general situation at or in the vicinity of the intersection. He [or she] must look in the careful and efficient manner in which a [person] of ordinary prudence in like circumstances would look in order to ascertain the existing conditions for his guidance.' " *Hefner v. Distel*, 813 A.2d 66, 70 (R.I.2003) (quoting *Dembicer v. Pawtucket Cabinet & Builders Finish Co.*, 58 R.I. 451, 456, 193 A. 622, 625 (1937)).

■■ Regarding this standard, Curtin testified at trial that he was so concerned by Ryan's erratic driving that he watched Ryan's vehicle travel from Curtin's left to Curtin's right until it disappeared from sight. However, Curtin did not look to his right before driving into the intersection, stating that his "vision was enough just to take in the intersection so [he] saw nothing coming from either side." A "second or two" after the traffic light turned green, he proceeded into the intersection. We disagree with defendants' contention that

Curtin's actions at the intersection and the fact that he had a green light could only lead to one conclusion. Our law regarding drivers at intersections, *Hefner*, 813 A.2d at 70, clearly anticipates that a driver with a green light still has a duty to meet a certain standard of care. Furthermore, we disagree with the trial justice's ruling that only "mere speculation or conjecture" would permit a jury to determine that Curtin did not exercise this standard of care before pulling into the intersection. Legally sufficient evidence was presented to allow a reasonable jury to find that Curtin's acknowledged failure to look to the right before pulling into the intersection—in light of the fact that he had just witnessed an erratic driver on the wrong side of the road traveling through the intersection—was a breach of the duty of care owed by a motorist as reiterated in *Hefner*. *Id.*

" '[C]onsider[ing] the evidence in the light most favorable to the nonmoving party,' " *Tedesco*, 871 A.2d at 927, evidence existed such that a reasonable jury could find for plaintiffs on this issue. The question should have been submitted to the jury to determine whether Curtin's failure to turn his head at the intersection equated to "look[ing] in the careful and efficient manner in which a [person] of ordinary prudence in like circumstances would look in order to ascertain the existing conditions for his guidance." *Hefner*, 813 A.2d at 70. We hold, therefore, that the trial justice erred in entering judgment as a matter of law in favor of defendants on this issue.

**B**

**Subrogation**

The defendants contend in their cross-appeal that the trial justice erred in denying their Rule 50 motion for judgment as a

matter of law based on Amica's purported lack of standing to bring a subrogation action in the name of plaintiffs. The plaintiffs counter that Amica did have both statutory and contractual insurance policy rights to pursue their claim against Curtin based on subrogation.[4]

▮ The defendants failed timely to provide this Court with the transcripts necessary for us to review the trial justice's decision. The defendants originally raised this issue prior to the impaneling of the jury in a motion for summary judgment, which was denied. In her decision on the Rule 50 motion, the trial justice did not explain the reasons why she denied the motion. Instead, she referred the parties to her previous denial of defendants' summary judgment motion on the same grounds, incorporating by reference the reasoning of her earlier decision, "rather than [her] restat[ing] the exact same reasons." The "arguments" contained in the transcript for the Rule 50 motion, the only transcript on this issue presented to this Court,. consist solely of a couple of sentences by defendants. We are unable to review the undoubtedly more substantial arguments presented by the parties at the earlier hearing on the motion for summary judgment referred to by the trial justice or the substance of the trial justice's ruling because defendants failed to supply this Court with a timely transcript of those proceedings.

▮ Article I, Rule 10(b)(1) of the Supreme Court Rules of Appellate Procedure dictates that "[w]ithin twenty (20) days after filing the notice of appeal the appellant shall order from the reporter a transcript of such parts of the proceedings not already on file as the appellant deems necessary for inclusion in the record." This Court has stated that the "failure to comply with this requirement may result in a dismissal of the appeal." *State v. Pineda*, 712 A.2d 858, 861 (R.I.1998). "It is well established that '[t]he failure to provide the Supreme Court with a sufficient transcript precludes a meaningful review and leaves us no alternative but to deny the appeal and uphold the trial justice's findings.'" *Bergquist v. Cesario*, 844 A.2d 100, 108–09 (R.I.), *cert. denied*, 542 U.S. 925, 124 S.Ct. 2888, 159 L.Ed.2d 786 (2004) (quoting *Patterson v. Patterson*, 792 A.2d 746, 747 (R.I.2002) (mem.)). A meaningful review of the issue in this case is precluded by defendants' failure to supply this Court with a timely transcript of the hearing on the motion for summary judgment. Accordingly, we leave this issue for another day in another case.

### Conclusion

For the reasons discussed above, we affirm the trial justice's ruling on the issue of standing based on defendants' failure timely to provide this Court with a sufficient transcript, and we reverse the ruling of the trial justice on the issue of negli-

---

4. At issue in defendants' motions is whether Amica Mutual Insurance Company has subrogation rights against defendants pursuant to G.L.1956 § 27–7–2.1(h):

"A person entitled to recover damages pursuant to this section shall not be required to make a claim against or bring an action against the uninsured or underinsured tortfeasor as a prerequisite to recover damages from the insurer providing coverage pursuant to this section. In the event that the person entitled to recover against

an underinsured motorist recovers from the insurer providing coverage pursuant to this section, that insurer shall be entitled to subrogation rights against the underinsured motorist and his or her insurance carrier. Release of the tortfeasor with the consent of the company providing the underinsured coverage shall not extinguish or bar the claim of the insured against the underinsurance carrier regardless of whether the claim has been liquidated."

gence. This case is remanded to the Superior Court for further proceedings not inconsistent with our opinion. The record shall be returned to the Superior Court.